# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## BOWMAN v ST JOHN HOSPITAL & MEDICAL CENTER

Docket Nos. 160291 and 160292. Argued April 8, 2021 (Calendar No. 1). Decided July 30, 2021.

Kelly Bowman and her husband, Vernon Bowman, brought a negligence action based on medical malpractice in the Macomb Circuit Court against St. John Hospital and Medical Center, Ascension Medical Group Michigan, and Tushar Parikh, M.D., alleging that Parikh erroneously advised Kelly Bowman that a growth in her breast was benign, on the basis of his interpretation of a 2013 mammogram. For the next two years, she felt the lump grow and sought follow-up care. In April 2015, she underwent a biopsy, which revealed "invasive ductal carcinoma with lobular features." In May 2015, she was diagnosed with metastatic breast cancer and underwent a double mastectomy, which revealed that the cancer had spread to a lymph node. In August 2016, soon after learning that the cancer had spread to her bone marrow, she sought a second opinion from a specialist and learned that the 2013 mammogram might have been misread. In December 2016, she and her husband initiated the proceedings in this case, sending a notice of intent to sue that tolled the period for filing a complaint. After the complaint was filed on June 12, 2017, defendants moved for summary disposition under MCR 2.116(C)(7), arguing that the two-year statutory limitations period had lapsed in June 2015 and that the Bowmans' complaint was untimely under the "discovery rule" in MCL 600.5838a(2), which allows plaintiffs alleging medical malpractice to sue within six months after they discover or should have discovered the existence of the claim, because Bowman should have discovered her medical malpractice claim by May 2015, when tests revealed metastatic cancer. The trial court, Richard L. Caretti, J., denied defendants' motions. Parikh and the hospital defendants appealed separately in the Court of Appeals, which consolidated the appeals. On August 13, 2019, the Court of Appeals, LETICA, P.J., and BOONSTRA, J. (RONAYNE KRAUSE, J., dissenting), reversed in a split, unpublished decision. During the pendency of the Court of Appeals proceedings, Kelly Bowman died, and her estate, represented by her husband, was substituted as a plaintiff. The Supreme Court granted plaintiffs' application for leave to appeal. 505 Mich 1069 (2020).

In an opinion by Justice CLEMENT, joined by Chief Justice MCCORMACK and Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court *held*:

Under *Solowy v Oakwood Hosp Corp*, 454 Mich 214 (1997), discovering the existence of a medical malpractice claim requires knowing a possible cause of the underlying injury. In this

case, which is still at the pleading stage, the record does not indicate that Kelly Bowman should have known before June 2016 that her delayed diagnosis might have been caused by a misreading of the 2013 mammogram. The available facts did not allow her to infer that causal relationship, and defendants have not shown that she lacked diligence. Accordingly, the present record did not allow a conclusion that, as a matter of law, the Bowmans initiated proceedings more than six months after Kelly Bowman discovered or should have discovered the existence of her claim.

1. The timeliness of a complaint alleging medical malpractice is evaluated under MCL 600.5838a(2), which sets forth the "discovery rule" applicable to claims of medical malpractice. The provision states, in relevant part, that a medical malpractice claim may be commenced at any time within the statutory limitations periods or within six months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later, but generally may not be commenced later than six years after the date of the act or omission that is the basis for the claim. Under this provision, the plaintiff has the burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least six months before the expiration of the period otherwise applicable to the claim. A medical malpractice action is barred if it is not commenced within the time prescribed by MCL 600.5838a(2). It was undisputed in this case that the complaint was filed after the two-year limitations period set forth in MCL 600.5805(8), and so the complaint was timely only if it was filed within six months after plaintiffs discovered or should have discovered the existence of the claim.

2. Since 1905, medical malpractice actions in this state have been governed by a two-year, statutory limitations period, with accrual of the cause of action being defined by caselaw. In 1932, the Supreme Court held that a claim did not accrue while treatment was ongoing and that a patient undergoing treatment had no duty to second-guess the treating doctor. In 1961, the Court held that a medical malpractice claim accrues on the date of last treatment by the negligent doctor, but it limited the holding to the facts of the case. Two years later, the Court adopted the discovery rule, holding that the limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should have discovered the wrongful act or omission. In 1973, the common-law discovery rule was challenged on the basis that it had been abrogated by the Revised Judicature Act, 1961 PA 236. Section 5838 of that act defined "accrual" as occurring when a doctor "discontinues treating or otherwise serving the plaintiff in a professional or pseudo-professional capacity as to the matters out of which the claim for malpractice arose," which codified the accrual rule stated and followed in cases preceding the enactment of the Revised Judicature Act. In 1975 PA 142, the Legislature amended MCL 600.5838 to include a discovery rule for claims of professional malpractice. The amendment provided that a malpractice claim accrues on the date of the last professional service, but it also gave plaintiffs a right to bring a claim within six months of when they discover or should have discovered the existence of the claim. In 1986 PA 178, the Legislature added § 5838a, which defined accrual and discovery for medical malpractice, leaving § 5838 to continue governing accrual and discovery for general professional malpractice. Although § 5838a was based on § 5838, it redefined "accrual," abrogating the last-treatment rule in favor of accrual with "the act or omission which is the basis for the claim of medical malpractice," and it added to the discovery rule a six-year period of repose. The Supreme Court interpreted the clause relevant to this case, "discovers or should have discovered the existence of the claim," in the legal-malpractice context

to mean that the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action, which occurs when a plaintiff knows a possible cause of the injury. The Supreme Court first applied this rule in the medical malpractice context in *Solowy*, which involved a plaintiff who had a cancerous lesion removed from her ear and was told by a doctor that there was no chance of the cancer's recurring. When she discovered a similar lesion on her ear five years later, a dermatologist advised her that the lesion might be a recurrence of the cancer, and a biopsy later confirmed that it was. The plaintiff brought an action alleging medical malpractice more than six months from learning that the lesion could be a recurrence of cancer but less than six months from confirming that it was. Applying the rule developed in the legal-malpractice context, the Supreme Court held that because the plaintiff had learned from a relevant professional, more than six months before suing, that an earlier professional might have committed malpractice, and because she had relevant experience with cancerous lesions of the ear, the plaintiff should have discovered her cause of action before she received the results of the biopsy.

3. When applying the statutory discovery rule, the plaintiff's diligence may play a role in evaluating whether and when the plaintiff should have discovered the existence of the claim. Under the common-law discovery rule, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action. In past cases, the Supreme Court has concluded that plaintiffs should have discovered a possible cause of action when they learned facts from which they could have inferred, without speculation or conjecture, that an earlier professional might have committed malpractice. But when the facts compel an inference of a possible cause, diligence has little role to play in evaluating whether a plaintiff should have discovered a possible cause of action. When the facts do not compel an inference of a possible cause but do arouse suspicion, diligence is required. Whether the facts should arouse a plaintiff's suspicion and thus trigger the duty to investigate is evaluated by applying a flexible, fact-specific inquiry, fueled by common sense and reason. Under that approach, facts arouse suspicion when they would make a reasonable plaintiff wonder whether the defendant is responsible. The facts that arouse a plaintiff's suspicions will vary from case to case, and the facts that might be salient to a doctor will not necessarily be salient to a patient. A court can account for a plaintiff's special knowledge reflected in the record, but generally plaintiffs can entrust their care to their doctors. In applying this flexible approach, courts should consider all the information available to and reasonably understandable by the plaintiff, including the plaintiff's own observations of physical discomfort and appearance, familiarity with the condition through past experience or otherwise, and the physician's explanations of possible causes or diagnoses of the plaintiff's condition. To trigger the duty to investigate, the plaintiff must possess at least some minimum level of information that, when viewed in its totality, suggests a nexus between the injury and the negligent act.

4. In this case, plaintiffs' claim was untimely only if they discovered or should have discovered a possible cause of action by June 2016. A plaintiff "should have discovered" a possible cause of action when the plaintiff knows facts that should arouse suspicions and does not diligently investigate. Kelly Bowman discovered the mass in her breast in 2013, brought it to her doctor's attention, continued to monitor the mass even after receiving the initial mammogram report that did not show cancer, noticed the persistence of the mass in 2014 and sought additional testing, continued to monitor the mass in 2015 and observed that it had increased in size, and

brought her concerns to her physician's attention to obtain further testing. Further, she continued to follow up and was diagnosed in July 2016 with cancer in her bone marrow. The next month, she sought a second opinion from a specialist, where she learned that the 2013 mammogram might have been misread. Although, as a procedural matter, these facts did not allow a conclusion that Bowman was diligent, they also did not allow a conclusion that she was not. Had there been evidence in the record to suggest that Kelly Bowman could have learned of defendants' responsibility had she exercised due diligence, summary disposition may have been appropriate. However, given the evidence that she had engaged in behavior that could be characterized as diligent, the case could not be resolved summarily at the pleading stage. Accordingly, defendants were not entitled to summary disposition.

Reversed and remanded for further proceedings.

Justice VIVIANO, concurring in the judgment, agreed that the Court of Appeals had erred by granting defendants summary disposition, but he disagreed with the majority's decision to identify a new point at which the limitations period in MCL 600.5838a(2) might or might not begin to run, namely, when the plaintiff's suspicions were aroused. *Solowy* held that the six-month discovery period commences when a plaintiff is aware of an injury and its possible cause. Justice VIVIANO believed that, despite *Solowy*'s misapplication of this standard, it offers a satisfactory and workable interpretation of MCL 600.5838a(2). He would have concluded that one of the factors that had emerged from caselaw to guide courts in this area—in particular, courts' refusal to impute expert medical knowledge to plaintiffs without a factual basis for doing so—was sufficient to resolve the present case. Justice VIVIANO would not have adopted the majority's new standard for the diligence analysis because it lacked grounding in Michigan caselaw, created a shifting time frame for the limitations period, would potentially impose additional burdens on plaintiffs that were inconsistent with the statute and Michigan caselaw, and was unnecessary in light of the current framework applicable to such cases.

Justice ZAHRA, dissenting, stated that the majority's holding was not consistent with the operative language of *Solowy*, and the majority's discussion of a plaintiff's diligence was also inconsistent with Supreme Court precedent and the statutory provisions under review because the period for bringing suit after discovery of a claim is statutorily limited to six months, regardless of diligence. Justice ZAHRA agreed that suspicion itself is not sufficient to start the discovery period, but it was an improper reading of *Solowy* to suggest that a plaintiff had license to suspect malpractice until facts compelled an inference of malpractice. In his view, the Court of Appeals majority correctly applied *Solowy* and reversed the circuit court's order denying defendants' motion for summary disposition. He noted that Kelly Bowman should have called her initial diagnosis into question after the biopsy performed on April 29, 2015, indicated that the mass she had discovered was cancerous; a diligent investigation of her physical discomfort, appearance, and condition following her May 2015 double mastectomy and the testing that revealed the cancer had spread to a lymph node would further call into question the alleged misdiagnosis, even for a layperson. Moreover, the record was devoid of any diligent investigation after May 28, 2015. Because plaintiffs failed to meet their burden under MCL 600.5838a(2), Justice ZAHRA would have affirmed the Court of Appeals' judgment.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 30, 2021

S T A T E  O F  M I C H I G A N

SUPREME COURT

VERNON BOWMAN, individually and as
Personal Representative of the ESTATE OF
KELLY M. BOWMAN,

       Plaintiffs-Appellants,

v

       Nos. 160291 and
            160292

ST. JOHN HOSPITAL & MEDICAL
CENTER, ASCENSION MEDICAL
GROUP MICHIGAN doing business as
ROMEO PLANK DIAGNOSTIC CENTER,
and TUSHAR S. PARIKH, M.D.,

       Defendants-Appellees.

BEFORE THE ENTIRE BENCH

CLEMENT, J.

When medical-malpractice plaintiffs sue outside the statutory limitations period,

they may avoid dismissal by suing within six months after they "discover[ed] or should

have discovered the existence of the claim." MCL 600.5838a(2). Here, Kelly Bowman was advised in 2013, based on an interpretation of a mammogram, that a growth in her breast was benign. For the next two years, she felt the lump grow and sought follow-up care. In 2015, she was diagnosed with metastatic breast cancer. In August 2016, soon after learning that the cancer had spread to her bone marrow, she sought a second opinion from a specialist and learned that the 2013 mammogram might have been misread. In December 2016, she initiated the proceedings in this case. The question before us is whether she "should have discovered the existence of the claim" over six months before initiating proceedings, i.e., before June 2016.

The answer is no. In *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 224; 561 NW2d 843 (1997), we explained that discovering "the existence of the claim" requires knowing a "possible cause" of an injury. The present case is at the pleading stage, and the record does not reveal that Ms. Bowman should have known before June 2016 that her delayed diagnosis might have been caused by a misreading of the 2013 mammogram. As explained below, the available facts didn't allow her to infer that causal relationship, and the defendants have not shown that Ms. Bowman wasn't diligent. The present record does not allow us to conclude, as a matter of law, that Ms. Bowman sued over six months after she discovered or should have discovered the existence of her claim. And so we reverse the Court of Appeals' judgment and remand to the trial court for further proceedings.

## I. FACTS & PROCEDURE

In June 2013, Kelly Bowman found a lump in her right breast and had a mammogram. Dr. Tushar Parikh interpreted the mammogram, diagnosed the lump as

2

"benign appearing cysts," and recommended annual mammograms. By 2015, Ms. Bowman noticed that the lump had grown. In April 2015, she underwent a biopsy, which revealed "invasive ductal carcinoma with lobular features," and in May, she underwent a double mastectomy, which revealed that the cancer had spread to a lymph node. In July 2016, a biopsy revealed that the cancer had spread further, into her bone marrow. In August 2016, Ms. Bowman sought a second opinion from a specialist, who told her that Dr. Parikh might have misread the 2013 mammogram.

Ms. Bowman decided to sue. Within six months of her meeting with the specialist, she sent a notice of intent to sue to the defendants in this case, Dr. Parikh, St. John Hospital and Medical Center, and Romeo Plank Diagnostic Center, which tolled the period for filing the complaint. See generally *Haksluoto v Mt Clemens Regional Med Ctr*, 500 Mich 304, 310-312; 901 NW2d 577 (2017). That notice was sent on December 10, 2016, and the complaint was filed on June 12, 2017, by Ms. Bowman and her husband, Vernon Bowman. In lieu of filing an answer, the defendants moved for summary disposition under MCR 2.116(C)(7), arguing that Ms. Bowman's complaint was untimely. The parties agreed that the two-year, statutory limitations period had lapsed in June 2015 (i.e., two years after Dr. Parikh's alleged misreading of the 2013 mammogram). But the defendants further argued that Ms. Bowman's complaint was untimely under the so-called discovery rule, MCL 600.5838a(2), which lets a medical-malpractice plaintiff sue within six months after she "discovers or should have discovered the existence of the claim." The defendants contended that Ms. Bowman "should have discovered" her medical-malpractice claim by May 2015, when tests revealed metastatic cancer. The trial court denied the defendants' motions.

3

Dr. Parikh and the hospital defendants appealed separately in the Court of Appeals, which consolidated the appeals and reversed in a split, unpublished decision, *Bowman v St John Hosp & Med Ctr*, unpublished per curiam opinion of the Court of Appeals, issued August 13, 2019 (Docket Nos. 341640 and 341663). The panel majority reviewed cases whose outcomes hinged on the plaintiffs' knowledge of their condition. In *Solowy*, the complaint was untimely because the plaintiff had waited over six months after learning information from which she could have inferred the possibility of earlier malpractice; but in *Jendrusina v Mishra*, 316 Mich App 621, 630; 892 NW2d 423 (2016), the complaint was timely because the plaintiff "had no previous history of kidney disease" and did not know about lab reports contextualizing his condition.

Here, the panel majority explained, Ms. Bowman knew a great deal about her condition over six months before sending the notice of intent:

> Kelly at all times knew exactly what her medical history was. She knew of her breast lump, knew that it was in the same location as it was at the time of the 2013 mammogram, and knew that it had grown larger. She did not lack any relevant data about her condition. Although (unlike in *Solowy*)[] she had not previously been diagnosed with cancer, she was fully aware of her cancer diagnosis, was fully aware her breast cancer had metastasized, and had undergone a mastectomy, all more than six months before she served her notice of intent or filed her complaint. [*Bowman*, unpub op at 7.]

The panel majority thus determined that the defendants were entitled to summary disposition on the basis that Ms. Bowman's complaint was untimely. Judge RONAYNE KRAUSE dissented. In her view, it is "common knowledge that not all breast lumps are cancerous even if they are uncomfortable or painful, that lumps may change over time yet remain benign, and that some initially-benign masses can become cancerous." *Id*.

4

(RONAYNE KRAUSE, J., dissenting) at 7. She noted that different cancers grow at different rates and added that "patients are entitled to trust medical professionals." *Id.*

During the pendency of the proceedings in the Court of Appeals, Ms. Bowman died, and she was replaced in this litigation by her estate, represented by Mr. Bowman. We granted his application for leave to appeal. See *Bowman v St John Hosp & Med Ctr*, 505 Mich 1069 (2020).

## II. DISCUSSION

The timeliness of the complaint here is evaluated under § 5838a(2) of the Revised Judicature Act of 1961, codified at MCL 600.5838a(2). Section 5838a(2) sets forth the "discovery rule" applicable to claims of medical malpractice and states in relevant part:

> Except as otherwise provided in this subsection, *an action involving a claim based on medical malpractice may be commenced at any time* within the applicable period prescribed in section 5805 or sections 5851 to 5856, or *within 6 months after the plaintiff discovers or should have discovered the existence of the claim*, whichever is later. However, except as otherwise provided in section 5851(7) or (8), the claim shall not be commenced later than 6 years after the date of the act or omission that is the basis for the claim. The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff. A medical malpractice action that is not commenced within the time prescribed by this subsection is barred. [Emphasis added.]

Mr. Bowman does not dispute that the complaint was filed after the two-year limitations period set forth in § 5805(8), and so the complaint here is timely only if it was filed "within 6 months after [Ms. Bowman] discover[ed] or should have discovered the existence of the claim."

5

We have interpreted the medical-malpractice discovery rule only once, in *Solowy*. But § 5838a has both statutory and common-law roots, which we now explore to understand the rule's source, development, and current meaning.

## A.  THE COMMON-LAW DISCOVERY RULE

Since 1905, medical-malpractice actions in this state have been governed by a two-year, statutory limitations period, which starts with accrual of the cause of action.  See 1905 PA 168; cf. MCL 600.5805(8).  Back then, accrual was not defined by statute.  In *De Haan v Winter*, 258 Mich 293, 296-297; 241 NW 923 (1932), we held that a claim did not accrue while treatment was ongoing, observing that a patient undergoing treatment is not "put to inquiry relative to the treatment accorded him"—in other words, a patient undergoing treatment has no duty to second-guess the treating doctor.  While *De Haan* had determined when accrual did not occur (i.e., during treatment), it took us nearly 30 years, until *Eschenbacher v Hier*, 363 Mich 676, 684; 110 NW2d 731 (1961), to hold that a medical-malpractice claim accrues on the date of last treatment by the negligent doctor.

*Eschenbacher* also addressed the discovery rule.  The plaintiff in that case was injured in a car accident and sought treatment from the defendant doctor.  Two months later, the plaintiff saw another doctor, who diagnosed a skull fracture left untreated by the defendant.  The plaintiff sued the defendant, 25 months after his last treatment and 23 months after learning of the skull fracture.  In other words, under the two-year limitations period, the suit was late as measured from accrual but was timely as measured from discovery.  After a directed verdict for the defendant, the plaintiff argued on appeal that the two-year limitations period did not start until he discovered the malpractice.  We disagreed,

noting that even after discovery the plaintiff still had 23 months—nearly two years—to sue. But we were uneasy about our strict application of the last-treatment rule and limited our holding "to the facts of this case." *Id*. at 684. We thus "reserve[d] for future consideration [the] applicability of the discovery rule," in "a case which presents a factual situation more appealing than that presented here." *Id*.

A more appealing case presented itself just two years later, in *Johnson v Caldwell*, 371 Mich 368, 371; 123 NW2d 785 (1963), overruled by *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 393 (2007). *Johnson* involved a case of what we'd now call "delayed diagnosis." The plaintiff had suffered postpartum complications, which she had described as something "protruding through [her] vagina," and alleged that the treating doctor had told her that "nothing could be done for her condition" and that "she would have to learn to live with it." *Id*. at 375. She last saw the treating doctor no later than June 1956. In late 1957 or early 1958, she was hospitalized for an unrelated pneumonia, and a nurse observed her condition and recommended that she consult a doctor. She did so, in January 1958, and the second doctor was able to surgically correct her condition. When she sued the first doctor, in January 1959, there was no question that her claim was time-barred under the last-treatment rule (measured from June 1956), but she urged us to apply the discovery rule.

We did so, acknowledging a nationwide trend toward the rule's adoption. And we recognized that "grave inequities" could follow if the last-treatment rule were not qualified by the discovery rule:

> It would be illogical and unintelligent to require a patient to determine on the date he last consults a physician that malpractice has taken place, when he in fact relies upon the advice that constitutes the malpractice. So to hold would

7

punish the patient who relies upon his doctor's advice and places a premium on skepticism and distrust. [*Id*. at 379 (cleaned up).]

We thus adopted the rule, articulating it as follows: "The limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should have discovered the wrongful act." *Id*.

We then applied that rule. We noted that the plaintiff had "accepted [the defendant's word that] nothing could be done for [her condition]." *Id*. And for about two years, no new information had presented itself such that she could, "by the exercise of reasonable diligence, have been expected to know of the claimed malpractice"—until she was hospitalized for pneumonia and advised to consult another doctor, which she did, "without untoward delay." *Id*. at 380. By then, we explained, she had become "obligationally aware of the fact of the alleged improper advice which was the basis of her cause of action." *Id*. And because her suit came within two years of her "obligational awareness," it was timely.

## B. THE STATUTORY DISCOVERY RULE

In *Dyke v Richard*, 390 Mich 739; 213 NW2d 185 (1973), *Johnson*'s discovery rule was challenged on the basis that it was abrogated by the Revised Judicature Act of 1961. Section 5838 of that act defined "accrual" as occurring when a doctor "discontinues treating or otherwise serving the plaintiff in a professional or pseudo-professional capacity as to the matters out of which the claim for malpractice arose." In *Dyke*, we explained that § 5838 had codified "the rule stated and followed in" *De Haan*. *Dyke*, 390 Mich at 744, quoting the RJA drafting committee's comment to this section.[1] *De Haan*, we continued,

---

[1] See Joint Committee on Michigan Procedural Revision, *Final Report of the Joint Committee on Michigan Procedural Revision* (Lansing: State Bar of Michigan, 1960), comment to § 41.20,

had "liberaliz[ed] . . . the general rule that the cause of action accrues at the time of injury," and the Legislature, in codifying that rule in § 5838, "no more intended to obviate the question of discovery than the *De Haan* court did." *Id*. at 747.

After *Dyke*, in 1975 PA 142, the Legislature amended § 5838 to include a discovery rule for claims of professional (not just medical) malpractice. The amendment expressly decoupled the discovery rule from accrual, stating that a malpractice claim accrues on the date of the last professional service, "regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." But what the Legislature took away through the rigid definition of accrual in § 5838(1), it gave back, at least in part, in § 5838(2), which codified a discovery rule, i.e., a right to bring a claim within six months of when a plaintiff "discovers or should have discovered the existence of the claim."

About 10 years later, in 1986 PA 178, the Legislature added § 5838a, which defined accrual and discovery for medical malpractice, leaving § 5838 to continue governing accrual and discovery for professional malpractice in general. Although § 5838a was based on § 5838, it included two important changes. First, it redefined "accrual," abrogating the last-treatment rule in favor of accrual with "the act or omission which is the basis for the claim of medical malpractice." See, e.g., *Morgan v Taylor*, 434 Mich 180, 192 n 17; 451 NW2d 852 (1990). Second, it added to the discovery rule a six-year period of repose.

---

p 314, available at <https://babel.hathitrust.org/cgi/pt?id=osu.32437121252098&seq=372> (accessed July 9, 2021) [https://perma.cc/NZ8W-K2X7].

### 1. *GEBHARDT v O'ROURKE*

Compared to the development of the common-law discovery rule, our caselaw on the statutory rule is spare. Our only case interpreting the relevant clause of MCL 600.5838a(2)—when "the plaintiff discovers or should have discovered the existence of the claim"—is *Solowy*. But because that language also is contained in MCL 600.5838(2), the general-malpractice counterpart to MCL 600.5838a(2), we also look to our one case interpreting that statute, *Gebhardt v O'Rourke*, 444 Mich 535; 510 NW2d 900 (1994).

*Gebhardt* was a legal-malpractice case. In the underlying matter, Ms. Gebhardt, represented by Mr. O'Rourke, had been convicted of aiding and abetting a sexual assault. Mr. O'Rourke last appeared at her sentencing, on February 3, 1987, the accrual date under MCL 600.5838(1). By the time of her sentencing, Ms. Gebhardt had retained a new lawyer, who moved on March 27 for a new trial on the basis that Mr. O'Rourke had, among other things "failed generally to provide a substantial defense." *Id*. at 538. Rather than grant a new trial, the trial court entered a judgment of acquittal, on July 11, 1988, which became final on April 19, 1989. Ms. Gebhardt sued Mr. O'Rourke for legal malpractice, on November 3, 1989. Since the claim had accrued on February 3, 1987, with Mr. O'Rourke's last appearance, the suit was plainly outside the two-year, statutory limitations period.

Whether Ms. Gebhardt's claim was barred under the discovery rule thus turned on whether she knew about her claim over six months before she sued. We looked to *Moll v Abbott Laboratories*, 444 Mich 1, 506 NW2d 816 (1993), which addressed the common-law discovery rule. Under *Moll*, "the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action." *Id*. at 29. *Moll* related a plaintiff's discovery of a "cause of

10

action" with her knowledge of "the causal connection between [the] plaintiff's injury and the defendant's breach." *Id*. at 16. After considering the policies animating limitations periods and the discovery rule, we determined that a "possible cause of action" is known when a plaintiff knows a "possible cause" of her injury. *Id*. at 22-24. When the plaintiff knows a "possible cause," we observed, the plaintiff is put "on equal footing with other tort victims whose situation did not require the discovery rule's protection" and so "is equipped with sufficient information to protect the claim." *Id*. at 24.

*Gebhardt* then applied *Moll*'s rule. We pointed out that Ms. Gebhardt's motion for a new trial "complained of Mr. O'Rourke's failure to provide a substantial defense." *Gebhardt*, 444 Mich at 545. She thus knew when that motion was filed "that Mr. O'Rourke's failure to provide a substantial defense was the possible cause of her harm." *Id*. Since that motion was filed on March 27, 1987, "some thirty-two months before she filed her malpractice claim," *id*. at 545-546, we held that the six-month discovery period had lapsed long before she sued.

## 2. *SOLOWY v OAKWOOD HOSPITAL*

*Solowy* came a few years after *Gebhardt* and let us consider the statutory discovery rule in a medical-malpractice context. In 1986, Ms. Solowy sought treatment for a lesion on her left outer ear, from Drs. Thomas & Johanna Chapel. The lesion was removed and diagnosed as basal-cell carcinoma. According to Ms. Solowy, one of the doctors "assured her . . . that the cancer was 'gone' and that there was no chance of it recurring," and no one "advise[d] that she should return for further follow-up or treatment." *Solowy*, 454 Mich at 216-217. Over five years later, in January 1992, Ms. Solowy "discovered a similar lesion

11

on her left ear, at approximately the same site. She described her symptoms as being nearly identical to those she experienced five years earlier, explaining . . . that she felt that 'it started all over again.' " *Id*. at 217. About two months later, on March 27, 1992, Ms. Solowy met with a dermatologist, who advised her that the lesion "was either a recurrence of the cancer or seborrheic keratosis," *id*. at 224, i.e., a benign growth. On April 9, 1992, the results of a biopsy confirmed that the lesion was a recurrence of the cancer. The advanced nature of the cancer resulted in the removal of the top part of Ms. Solowy's left outer ear.

Ms. Solowy sued, among others, the Drs. Chapel, alleging that their "representations to her that her cancer would not recur caused her to delay seeking treatment, resulting in a more radical and disfiguring surgery than would have been required if she had sought treatment earlier." *Id*. at 217-218. She sued on October 5, 1992, over six months from learning in March that the lesion could be a recurrence of cancer but under six months from learning in April that it was a recurrence. The appellate litigation thus focused on when— March 27 or April 9—Ms. Solowy knew or should have known that the doctors' statements constituted the "possible cause" of her injury.

As we had in *Gebhardt*, we started our discussion in *Solowy* with a nod to *Moll* and its "possible cause" standard. Following *Gebhardt* was justified, we explained, because the discovery rule for medical malpractice, in MCL 600.5838a(2), is relevantly identical to the discovery rule for professional malpractice, in MCL 600.5838(2). We thus focused on when a reasonable person in Ms. Solowy's place would or should have discovered that an act or omission of the defendants was a possible cause of her injury.

12

We evaluated whether Ms. Solowy knew or should have known on March 27, 1992, a possible cause of her injury. At the March 27 visit with the dermatologist, Ms. Solowy learned that the lesion "was either a recurrence of the cancer or seborrheic keratosis." That information contradicted what she'd learned back in 1986, i.e., that "there was no chance of [the cancer] recurring," and so Ms. Solowy had enough information at her disposal to know that her former doctors might have committed malpractice. Ms. Solowy thus was positioned similarly to Ms. Gebhardt: in each case, the plaintiff learned from a relevant professional, over six months before suing, that an earlier professional might have committed malpractice. Given what each had already learned, just as Ms. Gebhardt wasn't entitled to wait for the result of proceedings relating to her motion for a new trial, Ms. Solowy wasn't entitled to wait for the result of the biopsy.

And not only did Ms. Solowy have a professional's perspective to help her evaluate her former doctors' conduct, she had relevant experience with her disease:

> Even before the diagnosis was confirmed, Mrs. Solowy was aware that her symptoms were identical to those she experienced five years earlier. In her own words, "it started all over again." Consequently, her observations of the discomfort and of the appearance and condition of her ear should have aroused some suspicion in her mind that the lesion might be cancer. These observations, coupled with [her dermatologist's] explanation that the basal cell carcinoma could recur and that the lesion could be a recurrence of this cancer, supplied Mrs. Solowy with enough information to satisfy the standard. [*Id*. at 227-228.]

Given these circumstances, we declined to hold that the period started only when biopsy results gave Ms. Solowy more certain knowledge about the causal relationship between the statements of her former doctors and the progression of her lesion.

13

## C. THE ROLE OF DILIGENCE

Absent so far from this opinion's discussion of the statutory discovery rule is the plaintiff's diligence and the role it plays in evaluating whether and when the plaintiff "should have discovered the existence of the claim."[2] Our caselaw has risked creating confusion by describing two types of diligence in medical-malpractice cases. One type of diligence concerns the plaintiff's conduct during the discovery period—in particular, how quickly she sues after discovering a possible cause. In *Solowy*, for example, we noted that Ms. Solowy had "proceeded with some diligence in filing her claim." *Id*. at 225; see also *id*. at 222, 223, 225. But this type of diligence is distinguishable from the second type, the diligence in responding to suspicion about the cause of injury.

That second type of diligence is relevant to resolving the present case. Recall that under *Moll*'s common-law discovery rule, "the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action." *Id*. at 29. That rule has a subjective component ("when the plaintiff discovers") and an objective component ("when the plaintiff . . . , through the exercise of reasonable diligence, should have discovered"). This second type of diligence concerns only the rule's objective component.

---

[2] We recognize that neither *Gebhardt* nor *Solowy* grappled textually with what it means to discover the "existence of the claim." MCL 600.5838a(2). Those decisions chose instead to hitch the statutory discovery rule to its common-law predecessor, through *Moll*. We had asked the parties here to address whether *Solowy* was correctly decided and, if not, how MCL 600.5838a(2)'s discovery rule should be interpreted. See *Bowman*, 505 Mich at 1069. But because the plaintiffs prevail even under *Solowy*, we don't need to answer those questions today. We instead reserve them for a case whose outcome depends on whether *Solowy* properly interpreted MCL 600.5838a(2).

14

The issue of diligence remains underdeveloped in our recent malpractice caselaw. In both *Gebhardt* and *Solowy*, we concluded that the plaintiff "should have discovered" a possible cause of action when she learned facts from which she could have inferred, without speculation or conjecture, that an earlier professional might have committed malpractice. In Ms. Gebhardt's case, she could have inferred the possibility of legal malpractice on the part of her first lawyer when her second lawyer moved for a new trial. In Ms. Solowy's case, she could have inferred the possibility of medical malpractice when the dermatologist's statements directly contradicted those she'd received from her former doctors. When, as in those cases, the facts compel an inference of an injury's possible cause, diligence has little role to play in evaluating whether a plaintiff should have discovered a possible cause of action.

When the facts don't compel an inference of a possible cause but do arouse suspicion, we require diligence.[3] We reflected on that point in *Solowy*, noting that the plaintiff's "observations of the discomfort and of the appearance and condition of her ear should have *aroused some suspicion* in her mind that the lesion might be cancer." 454 Mich at 228 (emphasis added). Ms. Solowy had made those observations in January, but the discovery period did not start so early because she had responded diligently, by making an appointment with a dermatologist. In other words, suspicion itself doesn't necessarily start the discovery period; rather, it may require a plaintiff to investigate. See, e.g.,

_____

[3] Justice ZAHRA charges us with "read[ing] *Solowy* to provide a plaintiff license to suspect malpractice until facts 'compel an inference' of malpractice." *Post* at 3. But the sentence accompanying this footnote makes clear that when a plaintiff suspects malpractice, she must be diligent. Put otherwise, the diligence requirement qualifies whatever "license" the plaintiff holds.

15

*Johnson*, 371 Mich at 380 (reasonable diligence would not have uncovered facts before later hospitalization); *Dyke*, 390 Mich at 746 (period will not run where cause of action could not be ascertained "in the exercise of reasonable diligence"); *De Haan*, 258 Mich at 297 (claim doesn't accrue before patient "put to inquiry"). So Ms. Solowy did the right thing when she made an appointment with a dermatologist.

To evaluate whether the facts should arouse her suspicion and thus trigger her duty to investigate—whether a plaintiff is "put to inquiry"—we follow *Solowy* and look to the approach in Justice BOYLE's partial concurrence in *Moll*. See *Solowy*, 454 Mich at 226-227, discussing *Moll*, 444 Mich at 30-33 (BOYLE, J., concurring in part and dissenting in part). Justice BOYLE described a "flexible," "fact-specific" inquiry, fueled by "common sense and reason." *Moll*, 444 Mich at 30, 32. Under that approach, facts arouse suspicion when they make a plaintiff wonder whether the defendant is responsible. See, e.g., *id*. at 32 ("[I]f there were evidence . . . to suggest that plaintiff could have learned of defendant's responsibility had she exercised due diligence, summary judgment would be appropriate."). But the facts that arouse a plaintiff's suspicions "will vary from case to case." *Id*. at 33. That of course underscores the importance of the record and its development.

A court can account for a plaintiff's special knowledge reflected in the record, which is why we considered important Ms. Solowy's previous experience with skin cancer. But it's vital to understand that patients are not doctors. The facts that might be salient to a doctor won't necessarily be salient to a patient, and a typical patient can entrust her care to a doctor and needn't learn about medicine, let alone "personally diagnose her condition." *Id*. (quotation marks omitted). It follows that whether a plaintiff's suspicions have been

16

aroused often will depend not only on the knowable facts but also on what a patient learns and reasonably understands from her doctors. As we put it in *Solowy*, "[i]n applying this flexible approach, courts should consider the totality of information available to the plaintiff, including his own observations of physical discomfort and appearance, his familiarity with the condition through past experience or otherwise, and his physician's explanations of possible causes or diagnoses of his condition." 454 Mich at 227. In any event, the plaintiff must "possess at least some minimum level of information that, when viewed in its totality, suggests a nexus between the injury and the negligent act." *Id*. at 226.

## D. APPLICATION

Because Ms. Bowman sent the notice of intent to sue in December 2016, her claim is untimely only if she discovered or should have discovered a possible cause of action by June 2016. It does not appear from the present record that she had subjectively discovered a possible cause of action by then. The question rather is whether she *should have* discovered it. Both Dr. Parikh and the hospital defendants contend that Ms. Bowman should have discovered it by May 2015, when she was diagnosed with metastatic breast cancer. As indicated above, this objective discovery rule has two aspects. First, as in *Gebhardt* and in *Solowy*, a plaintiff "should have discovered" a possible cause of action when the available facts would let her infer malpractice. Second, as anticipated by Justice BOYLE's partial concurrence in *Moll*, a plaintiff "should have discovered" a possible cause of action when the plaintiff knows facts that should arouse her suspicions and doesn't diligently investigate.

17

The defendants seem to focus on the first aspect, given that diligence plays little role in their arguments. The hospital defendants assert that a person diagnosed with metastatic breast cancer "originating in a lump which had been palpable for two years[] would immediately have reason to question the prior imaging studies." They elaborate that Ms. Bowman "had reason to believe that it was both possible, and probable, that there was an error in the reading of the prior imaging studies." Dr. Parikh similarly asserts, "[W]hen Mrs. Bowman learned that she had metastatic breast cancer despite having been told that the very mass she was concerned about was not cancer, she should have discovered her injury (advanced breast cancer) and its possible, likely, or even probable cause (the delayed diagnosis due to the alleged misreading of the April 2013 mammogram)."[4] All defendants also suggest that Ms. Bowman wasn't attentive enough to campaigns for breast-cancer awareness.

We cannot follow the defendants' reasoning. As explained above, a plaintiff will be held to have discovered a possible cause of action when the facts allow her to infer the possibility of malpractice. The defendants urge, essentially, that a benign lump in 2013

---

[4] As Justice BOYLE recognized, it's a deadweight loss to bicker about when a plaintiff discovered a "possible cause" as opposed to a "likely cause." See, e.g., *Moll*, 454 Mich at 30 (BOYLE, J., concurring in part and dissenting in part) ("[T]here is no difference between 'possible' and 'likely' as the quantum of fact that triggers the statute [of limitations] under the discovery rule."); *id.* at 32 ("[I]t is . . . unwise to introduce a new battleground, i.e., the distinction between whether the cause-in-fact connection is 'possible' or 'likely[,]' into the statute of limitations arena."). We agree. We recognize that a plaintiff is not entitled to await "a definitive professional opinion" or a "subjective belief in the linkage between injury and cause." *Id.* at 31; accord *Solowy*, 454 Mich at 222 ("[T]he plaintiff need not know for certain that he had a claim."). Nor, however, must she feel pressed to protect her claim under an "anything is possible" standard. *Solowy*, 454 Mich at 226. Between these extremes, we look to whether a possible cause can be identified by reasonable inference or by diligence after one's suspicions have been aroused.

18

cannot be reconciled with a malignant metastatic lump in 2015. As authority for that proposition, they offer only statements lacking appropriate citation. For example, the hospital defendants state that cancer doesn't advance "magically" or spread "overnight." We'll take judicial notice of the former point. As for the latter point, we're not sure what it means. The gap from June 2013 to May 2015 is hardly "overnight." To be fair, we understand the defendants to be suggesting that cancer plods along, and maybe that's true. But two years isn't exactly swift. And in any event, unlike Justice ZAHRA, see *post* at 4, we will not impute to a plaintiff knowledge of cancer's progression without a record basis to do so. See, e.g., *Moll*, 444 Mich at 30 (BOYLE, J., concurring in part and dissenting in part) ("[T]he reasonable person test is sufficiently flexible to permit fact-specific application . . . ."). We emphasize that this case is at the pleading stage, and the evidentiary record consists primarily of Ms. Bowman's medical records.[5] Neither those records nor the ubiquity of pink-ribbon campaigns show that Ms. Bowman knew her cancer's timetable.[6]

---

[5] Justice ZAHRA has observed that the record contains "*no evidence at all* that Bowman was investigating this possible cause of action when . . . [she] sought a second opinion . . . ." *Post* at 5 (emphasis added). That's hardly surprising in light of this case's posture.

[6] The Court of Appeals panel majority had evaluated this case in terms of Ms. Bowman's knowledge of her condition, comparing her to the plaintiffs in *Solowy* and *Jendrusina*. It determined that because Ms. Bowman knew so much about her cancer, she was more like Ms. Solowy and less like Mr. Jendrusina, who knew little about his kidney condition. But we ask not whether the facts suggest illness, but rather whether the facts suggest malpractice. Similar errors affected the panel majority's consideration of *Hutchinson v Ingham Co Health Dep't*, 328 Mich App 108; 935 NW2d 612 (2019). See, e.g., *Bowman* (RONAYNE KRAUSE, J., dissenting), unpub op at 5-6.

The hospital defendants, as an afterthought, also accuse Ms. Bowman of acting without diligence: "Had she acted with reasonable diligence, she would have discovered her cause of action following her diagnosis of metastatic breast cancer on 05/28/2015." That assertion suggests that the diagnosis of metastatic breast cancer should have aroused her suspicions, causing her to inquire and then, perhaps, to discover that the misread mammogram caused her diagnosis to be delayed. That theory isn't senseless. We can imagine that a diagnosis of metastatic cancer could cause a patient to wonder what might have been done to catch it earlier and whether earlier diagnostic efforts had missed something. But on this record, we cannot tell whether Ms. Bowman wondered these or other things, and we are not prepared to hold as a matter of law that Ms. Bowman should have been suspicious.

The defendants thus seem to be asking us to hold as a matter of law that the facts about the lump's growth and the diagnosis should have aroused Ms. Bowman's suspicion. To start with, we cannot do that because, as we noted above, we will not impute to a plaintiff knowledge of cancer's progression without a record basis to do so. Perhaps if the mammogram were misread on Tuesday and the cancer were diagnosed on Wednesday, we could impute to the plaintiff the knowledge that cancer doesn't develop "overnight"; but that's not the present case.

Contrary to the hospital defendants' assertion, Dr. Parikh's brief indicates that Ms. Bowman exercised some diligence. Dr. Parikh's brief notes that women are "encouraged to conduct self-exams and to have regular mammograms." As Dr. Parikh goes on to explain, Ms. Bowman would seem to be a model patient in that regard:

20

Mrs. Bowman is the one who discovered the mass in 2013 and brought it to her doctor's attention; who continued to monitor the mass even after receiving the initial mammogram report that did not show cancer; who noticed the persistence of the mass in 2014 and sought additional testing; who continued to monitor the mass in 2015 and observed that it had increased in size; and who brought her concerns to her physician's attention to obtain further testing.

We'd add that she continued to follow up and was diagnosed in July 2016 with cancer in her bone marrow. And the next month, she sought a second opinion from a specialist (where she learned that the 2013 mammogram might have been misread). It would be procedurally inappropriate for us to conclude that Ms. Bowman was diligent, but these facts aren't enough to conclude that she wasn't.

Ms. Bowman seems to have done just what the medical community asked of her. She examined herself and found a lump. But according to her complaint, when she passed the baton to the professionals, they dropped it. So now Dr. Parikh (and much of the medical community, as amici curiae) suggest that she should have done more: second-guess their professional decisions and expertise. What's more, they ask us to enshrine that notion in law. We have avoided doing that before, and we will not do it now. See, e.g., *Moll*, 444 Mich at 33 (BOYLE, J., concurring in part and dissenting in part) (recognizing that medical advice can "lay[] to rest a plaintiff's suspicion regarding what caused his injury"), quoted in *Solowy*, 454 Mich at 227; *Johnson*, 371 Mich at 379 (avoiding a holding that "would punish the patient who relies upon his doctor's advice and places premium on skepticism and distrust"); see also *Bowman* (RONAYNE KRAUSE, J., dissenting), unpub op at 7 ("[P]atients are entitled to trust medical professionals.").

As Justice BOYLE put it, "if there were evidence in the record . . . to suggest that [Ms. Bowman] could have learned of [the defendants'] responsibility had she exercised

21

due diligence, [summary disposition] would be appropriate." *Moll*, 444 Mich at 32 (BOYLE, J., concurring in part and dissenting in part). Given that the present case is in the pleading stage, and given the evidence that Ms. Bowman engaged in behavior that could be characterized as diligent, we cannot resolve this case summarily. For these reasons, we hold that the defendants were not entitled to summary disposition.

## III. CONCLUSION

As explained above, the present evidentiary record doesn't show that Ms. Bowman sent the notices of intent to the defendants over six months after she discovered or should have discovered the existence of her claim. We, therefore, reverse the Court of Appeals' judgment and remand to the trial court for further proceedings.

> Elizabeth T. Clement
> Bridget M. McCormack
> Richard H. Bernstein
> Megan K. Cavanagh
> Elizabeth M. Welch

22

STATE OF MICHIGAN

SUPREME COURT

VERNON BOWMAN, individually and as
Personal Representative of the ESTATE OF
KELLY M. BOWMAN,

        Plaintiffs-Appellants,

v                                        Nos. 160291 and
                                          160292

ST. JOHN HOSPITAL & MEDICAL
CENTER, ASCENSION MEDICAL
GROUP MICHIGAN doing business as
ROMEO PLAN DIAGNOSTIC CENTER,
and TUSHAR S. PARIKH, M.D.,

        Defendants-Appellees.

---

VIVIANO, J. (*concurring in the judgment*).

I concur in the judgment reached by the majority because I agree that the Court of

Appeals erred by granting summary disposition to defendants. I disagree, however, with

the majority's decision to identify a new point in time at which the limitations period in

MCL 600.5838a(2) might (or might not) begin to run: when the plaintiff's suspicions were

aroused. Although the majority crafts this standard in an attempt to bring clarity to the role

of diligence in the analysis, I believe that longstanding caselaw has adequately addressed

this topic. Through the gradual progression of cases, various factors have emerged to guide

courts in this area. I would conclude that one of those factors—in particular, our refusal to

impute expert medical knowledge to plaintiffs without a factual basis for doing so—is

sufficient to resolve the present case.

I.  ANALYSIS

A.  THE CURRENT STANDARD

Under the "discovery rule" in MCL 600.5838a(2), a medical malpractice claimant can bring his or her claim "within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later."[1]  Our present standard for determining when a plaintiff "should have discovered the existence of the claim" comes from *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 227; 561 NW2d 843 (1997).  Although the *Solowy* standard has caused some confusion, I believe the problem does not lie with the standard itself.  The standard offers a satisfactory and workable interpretation of the statute.  In my view, at least some of the confusion results from *Solowy*'s misapplication of its own standard.

In *Solowy*, the plaintiff, Lucille Solowy, had previously had cancer on her left ear, but she was told after treatment that there was no chance the cancer would come back.  *Id*. at 216-217.  Nevertheless, approximately five years later in January 1992, the plaintiff

---

[1] The subsection reads, barring exceptions not relevant to this case:

> Except as otherwise provided in this subsection, an action involving a claim based on medical malpractice may be commenced at any time within the applicable period prescribed in [MCL 600.5805 or MCL 600.5851 to 5856], or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later.  However, except as otherwise provided in [MCL 600.5851(7) or (8),] the claim shall not be commenced later than 6 years after the date of the act or omission that is the basis for the claim.  The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff.  A medical malpractice action that is not commenced within the time prescribed by this subsection is barred.  [MCL 600.5838a(2).]

developed a lesion on her left ear; she explained that she felt " 'it started all over again.' " *Id*. at 217. The plaintiff saw a doctor, who told her on March 27 that the lesion was either cancerous or benign; a test was performed on that date, and the biopsy results came back on April 9 showing that the lesion was cancerous. *Id*. The Court, adopting a standard that had been developed outside the medical malpractice context—"[o]nce a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim"—held that the plaintiff should have discovered the claim on March 27, which was more than six months before she filed suit. *Id*. at 223, applying the standard from *Moll v Abbott Laboratories*, 444 Mich 1; 506 NW2d 816 (1993). On that date, the doctor's advice that the lesion was either cancerous or benign, in combination with the plaintiff's past experience, indicated that she should have known of the alleged malpractice. *Solowy*, 454 Mich at 224-225. We cautioned though that a "delay in diagnosis may delay the running of the six-month discovery period in some cases" and that the six-month period begins running when "the plaintiff possess[es] at least some minimum level of information that, when viewed in its totality, suggests a nexus between the injury and the negligent act." *Id*. at 226.

*Solowy* held that the statutory standard was met on March 27, when "the plaintiff knew of an injury, i.e., the progression of the lesion on her ear, and its possible cause, i.e., the failure of [the defendant doctors] to inform her that the cancer could recur and that she should seek follow-up treatment." *Solowy*, 454 Mich at 224. But on March 27, Solowy was not aware of an actual injury. She was certainly aware of the lesion on her ear, but she did not know whether it was cancerous or benign. All she knew at that point was that she had a *possible* injury. However, *Solowy*'s standard did not require that the plaintiff be

3

aware of a possible injury and its cause—instead, she must be aware of an *actual* injury and its *possible cause*. See *id*. at 223. Nevertheless, the *Solowy* Court imputed knowledge of the cancer diagnosis to Solowy because of her prior experience with the disease. This conclusion also runs counter to the principle, which *Solowy* acknowledged, that a plaintiff can rely on the explanations offered by his or her physician. See *Solowy*, 454 Mich at 227. Just as Solowy was entitled to trust her first doctor's explanation that her cancer would not recur, she was also entitled to trust the second doctor's description that the new growth was *either* a recurrence of cancer or a benign growth. Thus, properly applied, *Solowy*'s standard should have led the Court to find Solowy's claim to be timely.

Despite this misapplication, *Solowy* offers a workable standard, the parameters of which have been developed by caselaw. As the majority describes, several common themes and factors have emerged that guide the analysis. *Solowy*, for example, noted that its standard represented a "flexible approach" under which "courts should consider the totality of information available to the plaintiff, including his own observations of physical discomfort and appearance, his familiarity with the condition through past experience or otherwise, and his physician's explanations of possible causes or diagnoses of his condition." *Id*. at 227.[2] Another relevant factor or principle that the majority here

---

[2] "Some of these factors are listed in . . . MCL 600.5838a(2) . . . ." *Id*. at 227 n 4. The statute states, in relevant part, that the plaintiff bears the "burden of proving that the plaintiff, as a result of *physical discomfort, appearance, condition, or otherwise*, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim . . . ." MCL 600.5838a(2) (emphasis added). By listing things that would have been readily known to a layperson, the statute itself supports the notion that we should not impute medical knowledge to the plaintiff.

4

recognizes is that expert medical knowledge should not be imputed to lay plaintiffs absent a factual basis indicating that the plaintiff possesses such knowledge. See *Jendrusina v Mishra*, 316 Mich App 621, 626; 892 NW2d 423 (2016) (noting that the standard was based on the perspective of "a reasonable lay person"). Relatedly, we have indicated that a plaintiff may reasonably rely on his or her "physician's explanations of possible causes or diagnoses of his condition." See *Solowy*, 454 Mich at 227.[3]

## B. APPLICATION

I believe that the present case can be resolved based on these factors—in particular, the refusal to impute medical knowledge to a plaintiff. Kelly Bowman was told in 2013 that a lump in her right breast was benign; further tests in 2014 did not result in a cancer diagnosis. She continued to monitor the lump; after it grew in size, a biopsy performed in April 2015 revealed that the lump was indeed cancerous. In May 2015, a lymph node tested positive for cancer, confirming that the cancer had metastasized. Another biopsy performed in July 2016 revealed that the cancer had spread to Bowman's bone marrow. It

---

[3] See also *Moll*, 444 Mich at 33 (BOYLE, J., concurring in part) (noting caselaw explaining that a plaintiff should not be "expected as a matter of law to personally diagnose her condition") (quotation marks and citation omitted); *Johnson v Caldwell*, 371 Mich 368, 379; 123 NW2d 785 (1963) ("So to hold [that a plaintiff should conclude malpractice happened on the last day of treatment] would punish the patient who relies upon his doctor's advice and places a premium on skepticism and distrust."), overruled on other grounds by *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 393 (2007); *Leary v Rupp*, 89 Mich App 145, 149; 280 NW2d 466 (1979) (noting that "knowledge of the act and resulting injury alone may be insufficient to commence the running of the statute of limitations" because "the doctor himself may allay any suspicions the patient might have"); *Hutchinson v Ingham Co Health Dep't*, 328 Mich App 108, 135; 935 NW2d 612 (2019) (affirming the plaintiff's position that "until she received her biopsy results, she had every right to trust that defendants had provided her with a correct diagnosis concerning the lump in her breast.").

5

was not until August 2016 that Bowman was informed that the 2013 diagnosis was likely incorrect. She mailed a notice of intent to sue (NOI) under MCL 600.2912b within six months of that date.[4] As the current record demonstrates, Bowman was aware of an injury in April 2015. She did not learn of the possible cause—i.e., the underlying error from 2013—until August 2016, and there is nothing to show that Bowman "should have discovered the existence of [her] claim" before then. MCL 600.5838a.

Defendants argue that Bowman should have known of her cause of action before August 2016 because she should have known her cancer's timetable. In essence, they argue that she should have known that a cancer diagnosis in 2015 necessarily meant that the 2013 diagnosis was incorrect because the lump could not have been be benign in 2013 and malignant in 2015. But as the majority correctly asserts, "we will not impute to a plaintiff knowledge of cancer's progression without a record basis to do so." *Ante* at 19. I agree with the majority on this point. The 2015 diagnosis, alone, was not enough to indicate that malpractice had occurred in 2013. To hold otherwise would be to require plaintiff to study the "causes and speeds of progression" of the disease along with any other medical documentation from her treatment. *Jendrusina*, 316 Mich App at 633. As the Court of Appeals has noted, "there is no basis in statute, common law, or common sense to impute such a duty to people who become ill." *Id.* at 634. Because this case is at the pleading stage, summary disposition under MCR 2.116(C)(7) was inappropriate because there is a

---

[4] Filing an NOI in a medical malpractice lawsuit tolls the statute of limitations. See *Bush v Shabahang*, 484 Mich 156, 164-170; 772 NW2d 272 (2009).

question of fact regarding whether Bowman had reason to know that the 2013 diagnosis was erroneous.[5]  For this reason, I concur in the result reached by the majority.

## II.  THE MAJORITY'S STANDARD

Because the analysis above resolves the case, I decline to go further and adopt the majority's novel standard that is based on when a plaintiff's suspicions were aroused. Under this new framework, it appears that even if the *Solowy* standard is not met, the six-month limitations period under MCL 600.5838a nevertheless might start if the plaintiff becomes suspicious but fails to investigate.  "[F]acts arouse suspicion when they make a plaintiff wonder whether the defendant is responsible."  *Ante* at 16.

The majority's approach to MCL 600.5838a(2) suffers from significant flaws.  To begin with, it is derived entirely from a stray statement in *Solowy*, in which the Court stated that the plaintiff's "observations of the discomfort and of the appearance and condition of her ear should have *aroused some suspicion* in her mind that the lesion might be cancer." *Solowy*, 454 Mich at 228 (emphasis added).  This passage from *Solowy* did not cite or build upon caselaw.[6]  Nor did the statement purport to establish a new standard; *Solowy* nowhere

---

[5] See *Winfrey v Farhat*, 382 Mich 380, 388; 170 NW2d 34 (1969) (holding that there was a question of fact regarding whether plaintiff should have discovered the wrongful act when she had prolonged and persistent pain after a surgery); see generally 17 Mich Civ Jur, Medicine and Surgery, § 180, p 227 ("Summary disposition is improper in a medical malpractice action when a material factual dispute exists regarding the date of discovery of the alleged malpractice.").

[6] The majority here relies on other cases that supposedly refer to this point in time, but I disagree that any of those cases stand for the new time frame that the majority has constructed.  In *Johnson*, 371 Mich at 380, the Court merely held that the plaintiff did not know, nor could she have known, of alleged malpractice until her hospitalization—it was only at that time that she discovered the injury and error constituting malpractice.  In *Dyke v Richard*, 390 Mich 739; 213 NW2d 185 (2013), the Court simply described that one's

7

suggested that the point at which the plaintiff's suspicions were aroused was the point at which she needed to begin her investigation to preserve her claim.

Indeed, had *Solowy* applied the standard as the majority formulates it here, the result in that case would likely have been different. The plaintiff in *Solowy* was, in fact, diligent in seeking a medical test; yet the Court still held that the six-month period began to run before plaintiff could even obtain the results from that test. How could she have been deemed to be diligent through the point of getting the test, but not in the days after, when she had not yet received the results and the six-month discovery period nevertheless commenced? Properly applying the majority's test, it would make more sense to conclude that receipt of the test results constituted the point at which the plaintiff's duty to diligently investigate her claim ceased and her duty to diligently preserve her claim by filing suit began.

This raises another difficulty with the "arouses suspicion" standard: it seems to create a moving goalpost for the start of the limitations period. The majority suggests that

---

suit is precluded by the statute of limitations if "in the exercise of reasonable diligence" the plaintiff should have discovered the malpractice with the two years before the time the suit was filed. *Id*. at 739. The majority's reliance on *De Haan v Winter*, 258 Mich 293; 241 NW 923 (1932), which was superseded by 1986 PA 178, is even less persuasive. *De Haan* was a last-treatment-rule case from 1932 that far predated the adoption of the discovery rule by *Johnson* in 1963. There, the Court simply stated that, while treatment for an injury was ongoing, the "plaintiff was not put to inquiry relative to the treatment accorded him." *Id*. at 297. This "put to inquiry" phrase from which the majority somehow derives much of its framework merely set the point when the treatment ended and the statute of limitations began to run on the plaintiff's claim. See *id*. at 296-297. In sum, none of these cases supports the significance of or even mentions a point in time when a plaintiff's suspicions are aroused in relation to when a plaintiff is legally required to investigate his or her claim. Rather, they all simply describe the point at which the plaintiff should have known of the existence of his or her claim.

8

if suspicions are aroused and the plaintiff fails to investigate, then the six-month limitations period will begin to run when the suspicions arose. Presumably, then, if the plaintiff begins a diligent investigation, the clock will not commence until, under MCL 600.5838a(2) and *Solowy*, the plaintiff becomes aware of an injury and its possible cause. Thus, the period's starting point depends on whether the plaintiff was diligent or not. Yet neither the statute nor *Solowy* creates a starting point that can vary in this manner. Instead, to determine the commencement of the limitations period, a court must decide when the plaintiff knew of the injury and its possible cause. But under the majority's logic, if plaintiffs do not investigate, a court must find that they "should have discovered the existence of [their] claim" far in advance of when MCL 600.5838a and *Solowy* dictate they actually should have known of the claim.[7]

Relatedly, to the extent the majority suggests that a plaintiff's actual lack of diligence is dispositive, its new standard is in tension with the statute. As the majority appears to acknowledge, MCL 600.5838a(2) creates an objective test under which plaintiffs bear the burden of proving that a reasonable person in their position could not have discovered the claim sooner even with the exercise of reasonable diligence. See *Moll*, 444 Mich at 18 ("[T]he phrase 'should have known' is an objective standard based on an examination of the surrounding circumstances."); *id*. at 32 (BOYLE, J., concurring in part)

---

[7] Another possible effect of the early commencement of the limitations period under the "suspicions" standard is that it incentivizes plaintiffs to investigate all suspicions of malpractice. This no doubt means that plaintiffs who want to ensure that they have acted diligently will be more suspicious and will start second-guessing their doctors sooner. Cf. *Jendrusina*, 316 Mich App at 635 ("[I]t would also be highly disruptive to the doctor-patient relationship for courts to advise patients that they 'should' consider every new diagnosis as evidence of possible malpractice until proven otherwise.").

("With the doctrine of reasonableness as a constant and the standard of due diligence as a guide, courts are able to determine when a plaintiff knew or should have known of an injury and its possible or likely cause . . . ."). Plaintiffs who do indeed act diligently might have an easier time of making this showing because they will be able to show that, despite exercising reasonable diligence, they did not discover the claim earlier. But plaintiffs who did not act diligently might still be able to prove that—irrespective of their failure to act— a reasonable person acting diligently would not have uncovered the claim any sooner. Under the majority's framing, however, it appears that a plaintiff's failure to exercise diligence is fatal, even if the plaintiff can show that a reasonable person would not have discovered the claim any earlier.

Finally, I see no need to encumber the diligence analysis with the new and vague time frame that the majority develops here. Diligence has always played a role in the analysis. Even under the common-law discovery rule—which as the majority observes was codified in MCL 600.5838a—we stated that "[t]he limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should have discovered the wrongful act." *Johnson v Caldwell*, 371 Mich 368, 379; 123 NW2d 785 (1963), overruled by *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 393 (2007). As noted above, this state's caselaw has developed appropriate factors that courts have long relied upon to guide their analysis.

### III.  CONCLUSION

These concerns lead me to part ways with the majority's analysis.  I agree with its conclusion and parts of its discussion, including that this case can be resolved on the ground that we will not impute evidence of cancer's timetable to a plaintiff without a record basis to do so.  But that is where I would stop.  I would not adopt the majority's new standard applicable to the diligence analysis because it lacks grounding in our caselaw, creates a shifting time frame for the limitations period, potentially imposes additional burdens on plaintiffs inconsistent with the statute and our caselaw, and is unnecessary in light of the current framework applicable in these cases.  Accordingly, I concur in the judgment.

David F. Viviano

STATE OF MICHIGAN

SUPREME COURT

VERNON BOWMAN, individually and as
Personal Representative of the ESTATE OF
KELLY M. BOWMAN,

        Plaintiffs-Appellants,

v                                                 Nos. 160291 and
                                                    160292

ST. JOHN HOSPITAL & MEDICAL
CENTER, ASCENSION MEDICAL
GROUP MICHIGAN doing business as
ROMEO PLAN DIAGNOSTIC CENTER,
and TUSHAR S. PARIKH, M.D.,

        Defendants-Appellees.

_____

ZAHRA, J. (*dissenting*).

     I respectfully dissent. MCL 600.5838a(2) allows plaintiffs to overcome the two-year statutory limitations period by filing a medical malpractice complaint "within six months" after the plaintiff "discovers or should have discovered the existence of the claim . . . ." The Court granted leave in this case to address, in part, whether this Court's decision in *Solowy v Oakwood Hosp Corp*[1] adopted the correct standard for application of the six-month discovery rule set forth in MCL 600.5838a(2).[2]

---

[1] *Solowy v Oakwood Hosp Corp*, 454 Mich 214; 561 NW2d 214 (1997).

[2] *Bowman v St John Hosp & Med Ctr*, 505 Mich 1069 (2020). In 2017, the Court, citing *Solowy*, scheduled oral argument in *Jendrusina v Mishra*, 500 Mich 987 (2017), to consider whether to grant the application for leave to appeal or take other action on the question

In *Solowy*, the Court explained that the "six-month discovery rule period begins to run in medical malpractice cases when the plaintiff, on the basis of objective facts, is aware of a possible cause of action," which "occurs when the plaintiff is aware of an injury and a possible causal link between the injury and an act or omission of the physician."[3]

The majority affirms *Solowy*'s holding, which was primarily rooted in the Court's interpretation of MCL 600.5838a(2), in light of prevailing caselaw. *Solowy* unanimously held that the statutory phrase "should have discovered the existence of the claim" was satisfied "when the plaintiff learned that one of two possible diagnoses for her [condition] was potentially actionable because it was at this point that [the plaintiff] should have discovered a possible cause of action."[4] Conspicuously absent from the majority opinion is any reference to this dispositive holding. Further, the majority's holding that a medical malpractice plaintiff "should have discovered the existence of the claim" only when facts

---

"whether the plaintiff's complaint was timely filed under MCL 600.5838a(2)." The Court denied that application in 2018. *Jendrusina v Mishra*, 501 Mich 958 (2018). I found persuasive and joined then Chief Justice MARKMAN's dissenting statement concerning that order. *Id.* at 958-960 (MARKMAN, C.J., dissenting). Much like the instant case, *Jendrusina* turned on this Court's decision in *Solowy*, which interpreted the colloquially named "discovery rule" provided under MCL 600.5838a(2). The Court caused disappointment, in my view, by denying leave in *Jendrusina*, and leaving in place a published Court of Appeals' split decision bound to cause excessive litigation over its subjective approach to applying the reasonable-person standard under the statutory "discovery rule." *Jendrusina v Mishra*, 316 Mich App 621; 892 NW2d 423 (2016). The Court's earnest attempt in the instant case to provide clarity to *Solowy*'s interpretation of MCL 600.5838a(2) fails. In my view, the majority has adopted a standard that is inconsistent not only with the text of the statute but also with the holding of *Solowy*.

[3] *Solowy*, 454 Mich at 232.

[4] *Id.* at 216.

"compel an inference" of malpractice is not consistent with the operative language of *Solowy*.

The Court's discussion of a plaintiff's diligence is also perplexing and inconsistent with precedent from this Court and the statutory provisions under review. According to the majority, there are two types of diligence: (1) diligence in filing a lawsuit after discovering a possible cause and (2) diligence in responding to suspicion about the cause of injury. In addressing the first type of diligence, the majority observes, "In *Solowy*, for example, we noted that Ms. Solowy had 'proceeded with some diligence in filing her claim.' " Yet, when viewed in context, it is clear that the Court made reference to the diligence that Solowy had exercised in bringing her claim only to note that her situation was sympathetic.[5] More to the point, however, how quickly a plaintiff sues after discovering a possible cause is clearly and indisputably irrelevant. The period for bringing suit after discovery of a claim is statutorily limited to six months, regardless of diligence. Our Legislature has made that clear, and this Court is powerless to change the length of this period.

The majority's discussion of the second type of diligence is admittedly a thoughtful effort to harmonize our caselaw. I agree that "suspicion itself doesn't necessarily start the discovery period; rather, it may require a plaintiff to investigate." But the majority again improperly reads *Solowy* to provide a plaintiff license to suspect malpractice until facts "compel an inference" of malpractice. This standard is inconsistent with *Solowy*, which

---

[5] Specifically, the Court stated: "Mrs. Solowy's situation is sympathetic because she proceeded with some diligence in filing her claim." *Solowy*, 454 Mich at 225.

3

does not permit a plaintiff to rule out every nonmalpractice possibility until the remaining facts "compel an inference" of malpractice. In fact, *Solowy* rejected the approach adopted by the majority today:

> [W]e conclude in the present case that the period began to run when the plaintiff learned that one of two possible diagnoses for her [condition] was potentially actionable because it was at this point that she should have discovered a possible cause of action.[6]

In my view, the Court of Appeals majority correctly applied *Solowy* and reversed the circuit court's order denying defendants' motion for summary disposition. On June 11, 2013, Kelly Bowman's physician noted that she had complained of a lump in her right breast two weeks earlier. Bowman's screening questionnaire stated that she felt a lump or cyst in her right breast at the 9:00 position. Her physician recommended diagnostic testing, including a mammogram and an ultrasound. The 2013 mammogram, interpreted by Dr. Tushar Parikh, did not report cancer but recommended that Bowman undergo further mammograms on an annual basis. The report noted that "[i]n the areas of dense fibroglandular tissue, non-calcified lesions may be obscured."

I certainly do not fault Bowman for following Dr. Parikh's recommendation to continue self-exams and treatment to rule out whether the lesions were obscured. And in April of 2015, she reported to her physician that the lump had increased in size. Another

---

[6] *Solowy*, 454 Mich at 216. Apparently in an attempt to distinguish *Solowy*, the majority asserts that the plaintiff in that case "could have inferred the possibility of medical malpractice when the dermatologist's statements directly contradicted those she'd received from her former doctors." But the dermatologist only advised the plaintiff there were two possible diagnoses for the lesion, either malignant or benign. This explanation left open a nonmalpractice possibility that was expressly recognized in *Solowy*'s holding.

4

mammogram and ultrasound were ordered. The results of the mammogram and ultrasound were suspicious for cancer and led to a biopsy of the mass in her right breast at the 9:00 position. If Dr. Parikh's diagnosis was wrong to any extent, Bowman should have called that diagnosis into question after the biopsy performed on April 29, 2015, revealed that the mass was cancerous. And a diligent investigation of the root of Bowman's physical discomfort, appearance, and condition would have revealed to her additional facts that would further call into question Dr. Parikh's alleged misdiagnosis. These facts include the breast cancer diagnosis of invasive ductal carcinoma with lobular features, which was confirmed and reported on April 30, 2015, following the biopsy. And, in addition, the May 28, 2015 pathology report revealed "invasive ductal carcinoma [with] 2 foci" and "micrometastatic carcinoma involv[ing] one of eight lymph nodes[.]" These facts evidence a significant spread from the same mass allegedly misdiagnosed by Dr. Parikh. These facts would not be lost on a layperson. Simply stated, at that point, any reasonable person would seriously doubt and question whether Dr. Parikh failed to properly diagnose her condition in 2013. Further, the record is devoid of any diligent investigation after May 28, 2015. There is no evidence at all that Bowman was investigating this possible cause of action when, over a year later, on August 16, 2016, she sought a second opinion regarding her ongoing cancer treatment from Dr. Dennis Citrin, who told her that the 2013 mammogram had been misread and should have been interpreted as positive or suspicious for cancer. Moreover, it is important to mention that MCL 600.5838a(2) provides that "[t]he burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least

5

6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff." Because plaintiffs failed to meet this burden, I would affirm the Court of Appeals' judgment.

Brian K. Zahra